[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter was commenced by the plaintiff's complaint dated December 8, 1992. The plaintiff amended his complaint and is proceeding under his amended complaint dated May 17, 1993. The defendant's answer to said complaint is dated June 28, 1994. CT Page 7911 The plaintiff is Jeffrey W. Garms and the defendants are Gilberto Rojas and Rams, Inc. This matter arose out of an automobile accident on August 8, 1991 on Route 202 in Washington, Connecticut. The defendants have admitted liability so that the only issue before the court is, what damages if any, the plaintiff should receive from the defendants. The defendant Gilberto Rojas was operating a vehicle owned by the defendant Rams, Inc. at the time of this accident. At the time of the accident the plaintiff was operating his vehicle in a northerly direction and the defendant's vehicle was being operated in a southerly direction on said Route 202. The plaintiff testified that he saw the defendant's vehicle pull out of line of vehicles to pass some vehicles coming in the opposite direction to him. He testified that he could see that the defendant operator was not going to have enough space to pass all of the vehicles. This caused the plaintiff to try and pull to the right side of the road. He testified he saw the defendant operator pull in behind a third vehicle with the result being the defendant's vehicle hit that third vehicle causing it to come across Route 202 and strike the plaintiff's vehicle on the left front. The plaintiff testified his vehicle was almost off the road at the time of impact. The plaintiff testified that at the time of impact he was wearing a seat belt. When the defendant's vehicle hit the plaintiff's vehicle, the plaintiff hit his head on the back window of his truck, his back went forward and he hit his right knee on the dashboard or gear shift. An ambulance was called to the scene but the defendant did not use their services other than to allow the attendants to treat a cut he received in the accident[.] The force of the collision caused a tire to come off of the plaintiff's vehicle according to the plaintiff's testimony and damaged the suspension system in his vehicle.
The plaintiff testified that the next day which was August 9, 1991, his back, neck and right knee were sore. On August 10, 1991 the plaintiff was examined by Doctor Nicholas Bruce, a Chiropractor, for injuries he received in the said accident. Doctor Bruce had treated the plaintiff in 1981, 1986, 1989, 1990 and 1991 for back and neck problems (See Exhibits 4, 5, 6 and 7). The last time Doctor Bruce saw the plaintiff prior to this accident was on March 5, 1991 for a back problem. When Doctor Bruce saw the plaintiff on August 10, 1991, the plaintiff complained of pain in the neck, low back and right thigh and knee. The plaintiff treated with Doctor Bruce until December 12, 1991 when Dr. Bruce recommended he see an orthopedic surgeon for his knee problem. (See Exhibits F, G, H and I). Doctor CT Page 7912 Bruce testified at length concerning his treatment of the plaintiff for injuries he received in this accident and also for all of the treatment he rendered to the plaintiff prior to the accident. He testified that when he saw the plaintiff on August 10, 1991 his biggest problem was his knee. He stated he feels all of the plaintiff's complaints were casually related to his accident of August 10, 1991. He testified that in his opinion the plaintiff has a five (5%) percent partial permanent impairment of the cervical spine and a five (5%) percent partial permanent impairment of the thoracolumbar spine. He stated he last saw the plaintiff on April 28, 1994 when he returned for an evaluation and he was still complaining of pain in the neck and low back. (Exhibit F).
Doctor Anthony Sterling, an Orthopedic Surgeon, testified that he first saw the plaintiff on January 15, 1992 when he complained of pain in the right knee. After this examination, Doctor Sterling recommended that Mr. Garms obtain an MRI scan. This was done at St. Mary's Hospital on January 20, 1992. The results showed that the plaintiff had a Grade III appearing signal in the posterior horn of the medical meniscus and Grade II signals throughout the lateral meniscus. It also showed that the ligaments were intact. (Exhibit B). Doctor Sterling testified that a Grade III signal requires surgery and he recommended the same to the plaintiff. Doctor Sterling operated on the plaintiff on May 14, 1992. He reviewed with the court a video of that operation. Doctor Sterling said he had to remove more than fifty (50%) percent of the posterior medical meniscus including zone 2, all of zone 3 and part of zone 6. Doctor Sterling stated there are six zones in the meniscus. He also stated that he did not operate on the lateral meniscus because twenty-five (25%) percent of meniscus tears with Grade II signals heal by themselves. He stated that in his opinion he could state with reasonable medical certainty that the plaintiff will develop arthritis in the right knee as a result of the injury to his meniscus from this accident. He stated the plaintiff will do well but he will have a permanent injury. He stated that in his opinion the plaintiff has sustained a ten (10%) percent permanent partial disability of the involved lower extremity at the knee. (See Exhibit D). He also stated that if the plaintiff needed a future operation on the right knee that the surgeon's bill for that operation would be $3,000.00 to $3,500.00. He did not know what the hospital costs would be for such a future operation. He stated he used the American Medical Association's Guidelines and the Orthopedic Association CT Page 7913 Guidelines to determine the degree of permanency. He also said not all individuals get arthritis from this operation. He also stated that the right knee of the plaintiff's could have been further damaged between the date of the accident on August 8, 1991 and the date of the MRI scan on January 20, 1992 but that that did not appear to have happened in this case. Doctor Sterling discharged the plaintiff from his care on June 11, 1992.
The defendant had the plaintiff examined by Doctor Peter Barnett on July 13, 1994. Doctor Barnett testified in this matter. He stated that he examined the plaintiff's neck, back and right knee. (Exhibit 3). He testified that the plaintiff's neck exam was basically normal with mild discomfort at the extremes of movement. He stated with reasonable medical certainty that the plaintiff had no permanent injury in the neck area due to this accident. He stated that as to the back the plaintiff had degenerative changes that pre-existed the August 8, 1991 accident. He also stated that the injuries to the neck and back were soft tissue injuries that got better on their own. He stated he did not know if Doctor Bruce's treatment relative to the back and neck helped the plaintiff get better. As to the right knee, Doctor Barnett testified that X-rays of that knee were normal with no evidence of arthritis. At one point he stated that thirty (30) to thirty-five (35%) percent of the medical meniscus was removed by Doctor Sterling and at another point in his testimony, he stated twenty-five (25%) percent was removed. He further stated that there is no reason why the plaintiff could not participate one hundred (100%) percent in his work and other activities. He stated that with reasonable medical certainty that in his opinion the plaintiff would not need any further treatment for the knee. He stated the plaintiff should not worry about the future because of the injuries he received in this accident. He stated that the American Medical Association's Guidelines allowed a maximum permanency rating of ten (10%) percent if all of the meniscus is removed or if it was one hundred (100%) percent non functional. (Exhibit 2). In this matter Doctor Barnett testified that the plaintiff had a five (5%) percent permanent disability of the right knee attributable to this accident (Exhibit 3).
The plaintiff Jeffrey W. Garms testified concerning this accident. He stated that he had been an electrician since 1974 and had his own electrical contracting business since 1980. He testified that he saw Doctor Bruce for the injuries he received CT Page 7914 in this accident on August 10, 1991. He testified he hurt his back, neck and right knee in this accident. He stated that he first saw Doctor Bruce in 1980 or 1981 for back and neck injuries which he sustained when building a house. He stated he had not seen Doctor Bruce for his neck since 1980 or 1981 but he had seen him for his back many times since then. He stated that when Doctor Bruce recommended he see an orthopedic surgeon for his knee he saw Doctor Anthony Sterling. Doctor Sterling operated as stated hereinbefore. Mr. Garms testified that fifty (50) to eighty (80%) percent of his work involves overhead activity. He stated that when he does overhead work, his neck stiffens and that he wakes up the following morning with a tingling feeling and numbness in his hands.
Mr. Garms stated that after the knee operation, he was on crutches for three weeks. He stated since the operation the knee has had constant discomfort in it and if he bends the knee a lot during the day, it throbs at night. He testified that the weather affects the knee and that it frequently cracks. He stated that five weeks ago it cracked and he had to put a brace on it for a week. He testified that the right knee slows him down considerably at work where it now probably takes him twenty-five (25%) percent longer to do a job than it did prior to the operation on the knee. Mr. Garms stated he has not sought any further treatment with either Doctor Sterling or Doctor Bruce because he does not have insurance to pay for the same. He stated if he had such insurance, he probably would have gone back to those doctors. He stated that prior to this accident, he used to water ski, play volley ball, bowl and wrestle with his children. Now those activities are severely restricted because of his injuries. He stated he has the same problems with his back and neck today as he did when he went to Doctor Bruce immediately after the accident.
It was stipulated to by the parties that the defendant had medical bills totaling $9,706.56 (Exhibit A) and that he had a life expectancy of 28.9 years.
The plaintiff claimed he suffered a loss of income as a result of the injuries he sustained in this accident. He testified that for one month after the surgery he referred approximately twenty service calls to other electricians because he could not do them. He stated he gets $45.00 per hour for a service call and that they generally are one to one and one-half hours in duration. Also, he testified that at the time of the CT Page 7915 accident he was doing a job which he completed after he returned to work but that it took three or four weeks longer to finish because of the accident. However, this court finds that the plaintiff did not sustain his burden of proof on his lost wage claim and therefore the court does not find that he sustained any lost wages as a result of this accident. The plaintiff did not sustain his burden of proof on the issue of future medical expenses and the court does not award him any damages for those possible expenses.
The defendant admitted liability as to the first and second counts of the plaintiff's amended complaint.
The court does find that the plaintiff sustained a ten (10%) percent permanent partial disability of his right knee as a result of this accident.
The court awards the plaintiff economic damages of $9,706.56 and non economic damages of $80,000.00 for a total judgment of $89,706.56 plus costs. Included in the costs are the testimony fees of Doctor Anthony Sterling for $750.00 and Doctor Nicholas Bruce for $900.00.
Judgment may enter accordingly.
WILLIAM J. SULLIVAN, J.